WbutakeR, Judge,
delivered the opinion of the court:
In our former opinion in this case, reported in 129 C. Cls. 427, dealing only with the question of validity, we held that the invention disclosed in claim 1 of plaintiff’s patent consisted in adding to natural gasoline an amount of mesitylene, over and above the amount normally found therein. Gasoline produced from oil wherever found, except in two places, has a certain amount of mesitylene in it. Plaintiff discovered that the addition of more mesitylene to it would prevent a gasoline engine from knocking. That was his invention.
Mesitylene is one of the aromatic hydrocarbons; xylene is another. Before Bereslavsky’s patent, Taber and Essex had discovered that the addition of xylene to gasoline would prevent knocking; but we held that this patent did not anticipate Bereslavsky’s patent, because it emphasized xylene, whereas Bereslavsky emphasized mesitylene.
Now, defendant has produced a mixture which contains some mesitylene, but no more than is normally found in *436 natural gasoline produced by distillation, cracking, etc., with a minor and insignificant exception, now to be stated.
To the gasoline, defendant added an aromatic mixture, called CTC, which contained aromatic hydrocarbons, most of which had antiknock properties in varying degrees, as set out in finding 20. In volume this mixture was 6.85 per cent of the total. Only 5.25 per cent of this 6.85 per cent was mesitylene. Thus, mesitylene in defendant’s product was only 0.36 per cent of the total volume. The specifications of plaintiff’s patent called for mesitylene of from 5 to 20 per cent of the total.
Thus, it appears that the presence of mesitylene in defendant’s mixture was merely incidental. The trial Commissioner, after careful analysis of defendant’s mixture and comparison of it with plaintiff’s invention, concluded: “Its amount * * * was far too small to produce the result disclosed and intended by the patent in suit.” We thoroughly agree.
We are of opinion that defendant has not infringed plaintiff’s patent. Plaintiff’s petition is accordingly dismissed.
It is so ordered.
Laramore, Judge/ MaddeN, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Donald E. Lane, makes findings of fact as follows:
1. This is a patent suit alleging infringement of claim 1 of United States Letters Patent No. 1,713,589, issued May 21,1929, owned by the plaintiff, and entitled “Low-Compression Fuel.” The patent in suit was before this court in 1954 on the sole issue of validity of claim 1. The court’s opinion, dated October 5,1954, held claim 1 valid by stating “that the Patent Office was correct in issuing a patent to plaintiff covering his discovery that mesitylene in addition to that naturally found in gasoline, would prevent a knock.” The patent in suit is now before the court on the sole issue of infringement of claim 1 by the defendant.
*437 2. Claim 1 of the patent in suit reads:
1. A low compression motor fuel, such as gasoline or kerosene, containing a compound belonging to the mesitylene group.
3. The court’s opinion on validity stated that “the claim of the patent must of necessity be construed as meaning a motor fuel to which is added an amount of mesitylene in addition to that in the gasoline produced from petroleum, both by distillation and by cracking,” and that, “In short, it means adding more mesitylene than can be obtained from the gasoline itself.” The court’s opinion held that claim 1 is ambiguous, but that when one looks to the patent specifications, “there seems to be no doubt but that the inventor had in mind the addition to the motor fuel of mesitylenes which were not naturally found in that fuel.”
4. The evidence on the infringement issue comprises a detailed stipulation with exhibits filed March 13, 1956. The plaintiff has filed printed copies of this stipulation for convenient reference. The exhibits mentioned include transcripts of depositions taken in a civil action brought by plaintiff against the Sun Oil Company in the United States District Court for the Northern District of Ohio, Western Division, and also include the various reports identified therein. An earlier stipulation of facts, together with exhibits filed June 16, 1953, is also part of the evidence in this case.
5. The specific example of the alleged infringement to which the evidence presented relates is the making, by the Sun Oil Company, pursuant to directives issued by the Petroleum Administration for War, of “100/130” and “99/130” grades of aviation gasoline containing a petroleum distillate referred to in the records of the Sun Oil Company as CTC base. The letters CTC stand for catalytic thermal catalytic, and were used to designate a hydrocarbon material produced by three separate and consecutive cracking operations in which a petroleum was cracked first by a catalytic (Houdry) cracking process, second by a thermal cracking process, and third by another catalytic (Ploudry) cracking process. The accused aviation gasoline was man *438 ufactured to meet tbe requirements of certain specifications entitled “Army-Navy Aeronautical Specification Fuel; Aircraft-Engine, Grade 100” and the same for “Grade 130”. Grade 99/130 and grade 100/130 aviation gasoline are preponderantly mixtures of liquid hydrocarbons. These aviation gasolines had a permissive 90 per cent boiling point from 284° to 293° F. and a permissive end point of 356° F. The 90 per cent boiling point is the temperature at which 90 per cent of a liquid fuel sample is evaporated in a controlled distillation test. The permissive end point is the temperature at which the last of the liquid fuel sample is evaporated. The grade 100 specification required that the aviation gasoline manufactured thereunder have a “knock rating” not less than 100-octane number. The grade 130 specification required gasoline thereunder to have a lean mixture knock rating not less than 100-octane number, and to have a rich mixture knock rating not less than that of a specified reference fuel containing added tetraethyl lead. Separate specifications on methods of determining the knock ratings of fuels are identified in the basic aviation fuel specifications.
6. The knock properties of aviation gasoline have a very considerable effect upon the power which can be obtained from any given engine. An engine safely developing 1500 horsepower on grade 100/150 fuel may only be able to develop 500 horsepower on grade 73 fuel. Knocking is a form of too rapid combustion of the fuel mixture in an engine cylinder. It results in rapid energy release or detonation usually manifested by an audible knock in the engine. Knocking is also evidenced by overheating, increased vibration, loss of power, and reduced mileage per gallon. An increase in an engine compression ratio to obtain greater power from the engine tends to increase the knock tendency unless a fuel of higher grade is utilized.
7. When the fuel grade includes a number of 100 or less than 100, this number is the octane number. If the grade number is 100 or is above 100, the number is known as the performance number and indicates the relative power that an engine can develop safely with the knocking tendency *439 equal to that obtained with, grade 100 fuel. When the fuel grade includes two numbers, such as 100/130, the first number indicates the rating at lean mixture conditions of operation, and the second number indicates the rating at rich mixture conditions of engine operation.
8. The term octane number comes from a hydrocarbon compound known as octane, which has a high knock value. Octane is used in reference fuels to measure the knock value of other fuels. Octane is blended with heptane, another hydrocarbon that knocks very easily. Octane and heptane, when blended together, provide a means of determining the knock value of any fuel of 100-octane number or less. When a fuel is tested for knock value, a blend of octane and heptane is found which has an equal knocking tendency in the same engine. The amount of octane in this blend is the octane number of the fuel tested. Before the knock properties of octane were found, it was known that some compounds of lead which were soluble in gasoline had powerful effects in reducing engine knocking. The most effective of these lead compounds was found to be tetraethyl lead. One part by volume of this lead compound added to 8000 volumes of gasoline has a marked effect in reducing knock. Since an octane number of more than 100 cannot be measured in terms of octane, tetraethyl lead in octane is used to measure the knock value of fuels of more than 100-octane number.
Fuels of higher than 100-octane number are matched in knocking tendency against a mixture of iso-octane and measured quantities of added tetraethyl lead. The addition of about 1.3 milliliters of tetraethyl lead to a gallon (3785 milliliters) of iso-octane provides a reference fuel having a ;performance number of about 130.
9. The claim in suit specifies a “compound belonging to the mesitylene group.” The patent specification states that the mesitylene group includes mesitylene, its amino compounds and derivatives of the amino compounds. Mesitylene is an aromatic hydrocarbon known as 1,3,5-trimethylbenzene. The amino compounds include mesidine, diamino mesitylene, and triamino mesitylene, or their corresponding methyl and ethyl compounds. Mesitylene and the amino compounds of *440 mesitylene are antiknock compounds when admixed with or dissolved in gasoline. The patent in suit states that 20 grams of diamino mesitylene in 20 cubic centimeters of ethyl alcohol may be mixed into one gallon of gasoline to suppress knocking and to permit increasing the compression pressure of an engine about 20 pounds per square inch.
10. The accused fuel designated grade 100/130 aviation gasoline had an F-B or “lean-mixture” knock rating of 100 and an F-4 or “rich-mixture” knock rating of 130. The F-3 rating is determined by operating a standardized test engine under standardized conditions on the fuel to be rated and making a standardized comparison of the engine performance on that fuel with its performance on a standardized reference fuel. The F-3 rating conditions give a measure of the expected performance of the fuel in aircraft engines operating on a lean mixture, i. e., with a relatively high air-to-fuel ratio, which is the mixture employed for cruising. The F-4 rating is reached by operating a standardized supercharged test engine under other standardized conditions on the fuel to be rated and making a different standardized comparison of its performance on that fuel with its performance on the same standardized reference fuel. The F-4 rating conditions give a measure of the expected performance of the fuel in aircraft engines operating on a rich mixture, i. e., with a relatively low air-to-fuel ratio, which is the mixture employed for full throttle operation.
11. The Petroleum Administration for War furnished to petroleum refineries data on methods for estimating properties of aviation gasoline blends. Report No. 5 of the subcommittee on blending octane numbers of the aviation gasoline advisory committee, dated June 1, 1944, is exhibit J. Table III of said report lists hydrocarbons used in aviation gasoline manufacture, and tabulates their boiling points, their octane ratings, and their F-3 and F-4 blending values. In general, the addition of aromatic hydrocarbons increases the antiknock value of 100/130 aviation gasoline, although certain aromatics decrease said antiknock value. Aromatic hydrocarbons are classified as follows:

*441

12. There was no directive from the Petroleum Administration for War that mesitylene or its amino compounds be a specific component of the Sim Oil Company’s blended aviation gasoline. Toward the end of 1942, there was a large demand for aromatic hydrocarbons, and refiners were encouraged to maximize their production. Sufficient quantities of benzene, toluene, ethyl benzene, xylene, cumene, and BTX (benzene-toluene-xylene fraction from coal tar), constituting separately-added aromatic constituents used in blending aviation gasoline, were not available on the market. The Government urged the refiners to make any aromatic stocks that would extend the possibility of using more aromatics in aviation gasoline, and thus provide more high quality aviation gasoline. Sun Oil Company produced an aromatic CTC base, a mixture containing about 68 per cent aromatics, by the process disclosed in United States Letters Patent 2,430,096, issued to said company. The process included catalytic conversion, fractionation, pyrolytic (thermal) conversion, fractionation, catalytic conversion, and then a final fractionation step. Catalytic cracking processes available during World War II included the Houdry process (granular catalyst in a fixed bed), the Thermofor process (granular catalyst in a compact moving bed), and the fluid process (powdered catalyst handled as a fluidized moving bed).
*442 13. The aromatic CTC base was the product of distillation and cracking. Seven “cut analyses” of CTC base samples from different production runs between January 1943 and November 1944 were made by the Sun Oil Company. The average total aromatic hydrocarbon content of these samples was in the order of 70.5 per cent, consisting approximately of benzene .9 per cent, toluene 7.5 per cent, C8 hydrocarbons (which are principally xylenes), 26.6 per cent, C9 hydrocarbons (including mesitylene) 29.5 per cent, Ci0 (and heavier) hydrocarbons 6.0 per cent, all of the percentages being volume per cent of the CTC base. The relative proportions of the several hydrocarbons varied somewhat depending on the boiling range and the end point of the distillates and other variables in the process. The maximum and minimum total aromatic content recorded was 64.4 per cent and 75.4 per cent, respectively. The maximum and minimum C9 content recorded was 32.9 per cent and 21.54 per cent, respectively.
A complete analysis was made by the Sun Oil Company of one example of CTC base. This analysis showed the CTC base to contain 68 per cent total aromatics, 35.59 per cent Cs aromatics, 19.96 per cent C9 aromatics and 2.07 per cent heavier aromatics, and that 5.25 per cent of the total sample was mesitylene. This is approximately 26.3 per cent of the C9 aromatics. The end points of the samples of CTC base varied from 352° to 375° F.
14. In the production of 100/130 aviation gasoline for the defendant, a plurality of ingredients was blended to produce a fuel meeting the F-3 and F-4 antiknock ratings required. Typically, this gasoline comprised three principal classes of hydrocarbon components as follows:
A. Aviation base stock composed of cuts of appropriate boiling range produced mainly by catalytic cracking and to a lesser extent by straight run distillation of selected crude fractions and to a much less extent by thermal cracking, such stock being generally of lower F-3 and F-4 rating than the final gasoline blend;
B. Iso-paraffinic blending agents, specially synthesized, non-aromatic petroleum hydrocarbon products boiling in the aviation gasoline range and exceeding both the F-3 and F-4 knock ratings and consisting principally, of alkylates and including hydrocodimers and hot acid octanes; and
*443 C. Aromatic hydrocarbons derived either from coal tar or from petroleum. Aromatic concentrates prepared from petroleum by special processes involving a plurality of catalytic cracking, or catalytic and thermal cracking steps and also including cumene made by catalytically alkylating benzene with propylene.
Tetraethyl lead was always essential and was invariably included in the maximum amount permitted by specification. Tetraethyl lead can be used to improve knock rating and performance number only to a limited extent. Each added increment of tetraethyl lead is less effective than the previous increment. In practice the lead content was limited, by regulations, to 4.6 milliliters per gallon maximum in order to protect the exhaust valves from excessive corrosion and deposits.
15. A typical 100/130 aviation gasoline produced by Sun Oil Company comprised a small percentage, typically about 6 per cent of straight run gasoline produced by distillation, and a much larger proportion of catalytically cracked gasoline, typically about 44 per cent and containing about 0.38 per cent mesitylene, none of said gasoline by itself meeting either the required F-3 or F-4 antiknock rating; alkylate added in varying proportions averaging about 36.5 per cent and by itself meeting both the required F-3 and F-4 antiknock ratings; a relatively small proportion of one or more of the aromatic hydrocarbons, benzene, toluene, ethyl benzene, mixed xylenes and cumene, each of which could be produced during World War II as isolated compounds in commercial quantities, all contributing to the attainment of the gasoline quality, and in addition to or in lieu of the last-named aromatic hydrocarbons, the aromatic mixture, CTC base. The CTC base was added to the blend in varying proportions, averaging about 6.25 per cent and contributed to the attainment of the desired gasoline quality.
The content of any knock-suppressant of the CTC base, of which mesitylene is one of a number, improved the antiknock characteristics of the resultant motor fuel to the extent that it was present in the resultant fuel. If aviation gasoline to which such mixture was added should fall short of meeting specifications, another or other antiknock agents would have to be added in quantity to obtain the specified octane value of *444 the 100/130 aviation gasoline. This could be done by adding a little more of one of the above-mentioned aromatics, or by adding somewhat more of the CTC base, or by slightly increasing the amount of alkylate.
16. Mesitylene is defined in the 1913 edition of Webster’s Dictionary as follows:
A colorless oily hydrocarbon, C8H3 (CH3)3, occurring in coal tar and petroleum, and also prepared artificially, as by distilling acetone with sulphuric acid. It is the symmetrical trimethyl derivative of benzene.
A research paper, Volume 39, November 1947, of the United States Department of Commerce presents in table 3 the percentage by volume of mesitylene present in seven representative crude petroleums, as follows:
(A) Ponca, Okla_0.12
(B) East Texas_0.09
(0) Bradford, Pa_0.17
(D) Greendale-Kawkawlin, Mick_0.05
(E) Winkler, Tex_0. 05
(F) Midway, Calif_0.05
(G) Conroe, Tex_0.36
This table also shows that the mesitylene content of the naphtha fraction (104-356° F.) of the same crude petroleums varies from 0.22 per cent to 1.35 per cent by volume of the naphtha fraction. The naphtha fraction (104-356° F.) is a close approximation to the gasoline fraction (104-401° F.).
In connection with this report of 1947, the parties have agreed as follows:
There is no evidence to show, and no reason to believe, that the average composition of petroleum in the ground has changed between the earliest date of any of the references listed * * * and the present, and analyses of samples of petroleum taken and made subsequent to that date may be considered to have the same force and effect that they would have if they had been taken and made at the present time, and vice versa.
Petroleum Redwood (1913) pp. 246, 247, refers to the aromatic hydrocarbons of the benzene series found in petroleum from different fields, and lists a number of petroleums from different sources which contain mesitylene.
Das Erdöl, Engler & Hofer, Vol. 1, pp. 356-368, and pp. 573, 577, is an elaborate summary of the literature relative *445 to the occurrence of aromatic hydrocarbons of the benzene series in petroleum from many localities. It also contains some discussion of the changes in composition resulting from cracking of heavy oils with the formation of aromatic compounds, including mesitylene.
It was known in general before the date of the application for the Bereslavsky patent that the aromatics increased the antiknock value of gasoline. Benzol and others had been used to decrease the knocking tendency of gasoline. In addition, it was known that the amino compounds, particularly aniline and xylidine, were effective.
17. The United States patent to Midgley No. 1,296,832 issued on March 11,-1919, prior to Bereslavsky’s filing date. This patent was not cited by the Patent Office during the prosecution of the Bereslavsky application. This patent discloses and claims an engine fuel comprising a mixture of a hydrocarbon of high compression value with a hydrocarbon of lower compression value, the proportions being such as to make the mixture of fuel of predetermined intermediate compression value. A mixture of 50 per cent kerosene and 50 per cent benzol is disclosed. The Midgley patent teaches that a fuel composed of a mixture of hydrocarbons may have proportions such as to provide a fuel with which any practical compression ratio may be attained without the objectionable knock. This patent teaches that benzol or analogous cyclic hydrocarbons may be added to kerosene to secure a blended fuel having the desired antiknock quality at the desired compression value. Benzol is a volatile liquid hydrocarbon containing benzene ring and similar compounds. Cyclic hydrocarbon compounds are characterized by a ring or closed chain formation.
18. The United States patent to Taber and Essex No. 1,495,501 issued on May 27, 1924, prior to Bereslavsky’s filing date. This patent was not cited by the Patent Office during the prosecution of the Bereslavsky application. This patent discloses and claims a motor fuel consisting of gasoline modified by adding a mesitylene-containing mixture thereto. The patent further states that the fuel may be from 70 parts of gasoline, with 30 parts of solvent naphtha added, to 10 parts of gasoline with 90 parts of solvent naphtha *446 added. The solvent naphtha is stated in the Taber and Essex patent to consist principally of xylenes, together with ethyl benzol, mesitylene and analogous benzol derivatives. The catalog of benefits derived from the use of this additive to gasoline recited in the patent is that the fuel gives improved operation, including better fuel economy, materially increased flexibility, greater maximum power, more horsepower in climbing hills, and that it was found possible to run steadily on level stretches of road in high gear at a low speed of 1 mile an hour, whereas the best that could be done with gasoline was 3 miles an hour under the same conditions. It was also found possible to accelerate the automobile from 3 miles an hour to 25 miles an hour as compared to 3 miles an hour to 22 miles an hour in the same time interval when compared to the fuel without the additive; also, a very materially decreased speed due to throttling, as compared with gasoline and without the modification of the carburetor adjustment set for gasoline. While this patent does not specifically use the term “antiknock”, all of these benefits are concomitant with decreased engine knock.
19. The parties have stipulated that gasoline produced by distillation before and after 1925 in straight run gasolines contained a great number of hydrocarbons (all naturally present in the crude) which may be classified as follows:
1. Paraffins
Normal paraffins
Isoparaffins
2 Naphthenes
3. Olefins (present, if at all, in very small proportion)
4. Aromatics Boiling points
C„ Benzene_176° F.
C, Toluene_231° F.
Os Aromatics
m-xylene_ 282° 'F.
p-xylene_281° 'F.
o-xylene_ 292° ' F.
ethyl benzene_ 277° F.
Cs Aromatics
Iso-propyl benzene (cumene)_ 306° ' F.
n-propyl benzene-319° 'F.
o-methyl ethyl benzene_ 329.2° ’F.
m-methyl ethyl benzene_ 322.7° ' F.
1,3,6 trimethyl benzene (mesitylene)_ 328.3° 1 F.
1,2,4 (pseudocumene)_ 337.7° 'F.
1,2,3 trimethyl benzene (hemimellitene) „_,_ 349.7° 'F
*447 and a number of higher boiling aromatics. The straight run and thermal cracked gasolines contain some mesitylene when of the proper boiling range. Many crude oils contain mesitylene.
20. Prior to September 17, 1925, the filing date of the patent in suit, the effectiveness of tetraethyl lead and of certain benzene compounds for increasing the antiknock quality of gasolines was known. Among the known benzene compounds having antiknock qualities were — •
Benzene
Toluene (mono-methylbenzene)? about one thirtieth as effective as tetraethyl lead within the permissible tetraethyl lead range.
Aniline (mono-aminobenzene) and toluidines (amino-toluenes) , about ten to fifteen times greater in antiknock quality than benzene and toluene.
Xylenes (dimethyl benzenes), the meta-xylene and the para-xylene being more effective than toluene, and the ortho-xylene now known to be less effective than toluene.
Xylidines (aminoxylenes), mixtures thereof being ten to fifteen times more effective than benzene and toluene.
Pseudocumidine (amino 1,2,4-trimethylbenzene), about fifty times more effective than aniline.
These aromatic or benzene ring compounds including mesi-tylene and its amino compounds may be represented diagrammatically as illustrated herewith.

Aromatic Benzene Bing Compounds

*448

21. Plaintiff admits that “the Taber and Essex patent describes a fuel containing whatever mesitylene might be present in the distillates making up the fuel.” Plaintiff admits that “the Court has found that claim 1 of the patent in suit must be construed to exclude fuel containing such incidental mesitylene.” It is immaterial that one of the Taber and Essex distillates (naphtha) is a coal tar distillate, and the Sun Oil CTC base is a petroleum distillate. The presence of mesitylene in the Taber and Essex fuel is incidental. The *449 presence of mesitylene in tlie benzene ring aromatics in the Midgley antiknock fuel is incidental. The presence of mesi-tylene in the accused aviation fuel is likewise incidental. The presence of mesitylene amino compounds, if any, in the Taber and Essex fuel, the Midgley fuel, or the accused aviation fuel is also incidental.
22. The plaintiff filed an application for a British patent corresponding generally to the patent here in suit. The British Bereslavsky patent No. 258,550 specifies and claims the use of substantially isolated mesitylene or its derivatives to suppress fuel knocking. The accused aviation fuel is not the product of blending or adding substantially isolated mesity-lene to gasoline or kerosene.
23. The parties have stipulated that a report on an analysis of coal tar hi-flash naphtha, dated March 28,1945, contains a calculation to the effect that coal tar naphtha having a boiling range of 284° to 356° F. contains 94 per cent total aromatics and 9.8 per cent mesitylene. The addition of 90 parts of such a solvent naphtha to gasoline would result in an added mesitylene content of 8.8 per cent of the blended gasoline. The addition of 30 parts of such a solvent naphtha to gasoline would add about 2.84 per cent mesitylene to the gasoline. Other samples of solvent naphtha manufactured after 1940 were analyzed to determine mesitylene content and were found to contain 8.2 per cent, 9.8 per cent, and 10.5 per cent, respectively, of mesitylene. There is no evidence of the mesitylene content of commercial solvent naphtha of 1924, the year during which the Taber and Essex patent issued. Using the 1940-1945 data on naphtha analysis, fuel prepared under the teachings of the Taber and Essex patent would contain approximately 2 to 9 per cent incidental mesitylene.
24. The parties have stipulated that mesitylene was not given consideration as an isolated aromatic to be added to the blend, firstly, because it had too high a boiling point to be an ideal component, and, secondly, because no method of manufacturing it in isolated form other than from acetone was commercially used during the alleged period of infringement. The manufacture of isolated mesitylene involved great expense, and was done on a very small scale in order to obtain isolated mesitylene for experiments.
*450 25.The parties have stipulated that a typical 100/130 grade aviation gasoline prepared by Sun Oil Company during World War II had the following constitutents in the percentage indicated:
Mostly straight run gasoline_ 6. 00
Oatalytieally cracked gasoline_44.00
Alkylate and other isoparaffins_36.50
Separately added benzene, toluene, ethyl benzene, xylene, cumene and BTX fraction_ 6. 50
Aromatic OTO mixture containing about 68 per cent aro-matics_ 6.85
Tetraethyl lead_ . 125
The mesitylene content of a CTC base mentioned in finding 13 was 5.25 per cent. Using this figure, the mesitylene content of the above typical 100/130 grade aviation gasoline due to the added CTC mixture is about 0.36 of one per cent. Using a CTC mixture having a greater content of the C9 aromatics, such as a mixture containing twice as much mesitylene, would increase the mesitylene content of the aviation gasoline due to added CTC mixture to about 0.72 of one per cent. The parties have stipulated that the presence or absence of 0.125 per cent of mesitylene in actual aviation gasoline would have no measurable effect on octane rating. It was further stipulated that Dr. J. Bennett Hill, Director of the Research and Development Department of Sun Oil Company, if called, would testify that tests show that for additions of 0.6 per cent or approximately 1.8 per cent of mesitylene to a fuel and determinations of the F-l and F-2 octane numbers before and after such additions, there was no detectable difference in the octane numbers caused by the addition of either one of these two quantities of mesitylene.
26. The plaintiff has testified that he added 5 per cent mesitylene to a reference fuel in his experiments and found that it gave an improvement considerably smaller than sufficient to permit an increase of compression pressure of twenty pounds, but that probably less than 20 per cent added mesitylene would permit such an increase.
27. There was less mesitylene in the finished gasoline of the Sun Oil Company by the addition of CTC base than there was in the gasoline of the Taber and Essex patent by the addition of solvent naphtha. There is no proof that the Sun Oil Company added mesitylene per se to gasoline for *451 the purpose of increasing the compression pressure thereof or for raising the knock value thereof. Mesitylene included in the accused aviation gasolines blended by Sun Oil Company was only an incidental inclusion by virtue of its presence in minute amounts in the CTO distillate and/or other mixtures derived from petroleums.
28. Claim 1 of Bereslavsky patent 1,713,589 was not infringed by the addition of the CTC base to aviation gasoline.
29. The above findings of fact include only some of the material set forth in the findings accompanying the court’s opinion on validity. Accordingly, the original fourteen findings are incorporated herein only by this reference thereto.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.